## THE INCA.

### (District Court, S. D. Georgia, E. D.   March 14, 1904.)

**1. TOWAGE—CARE REQUIRED OF TUG.**

A tug, undertaking a towage service, is bound to the exercise of ordinary care and maritime skill, and the master is bound to know the channel, and its usual currents and dangers, which are known generally to men experienced in its navigation, and to exercise such skill and knowledge for the protection of his tow.

**2. SAME—LOSS OF TOW—LIABILITY OF TUG.**

A tug undertook to tow a bark laden with lumber down the Satilla river, in Georgia, where she had often towed vessels during a number of years.   The tug proceeded near the left-hand side of the channel, a short distance outside of which, some half a mile from the starting point, at a bend in the river, there were a number of piles of stone, where vessels had unloaded ballast, and on one of which the bark grounded, striking toward the stern, which was deepest in the water.   The tide was rising, and she would have floated in a short time; but the master of the tug, after several attempts, pulled her off, but in doing so she was injured, so that she sank almost immediately.   The obstructions had been there for many years, and were known to pilots and navigators of the river, but were not known to the master of the bark, who was wholly unacquainted with the river or its channel.   At the place of the accident the channel was 200 feet wide, and the river some 375 feet.   The master of the tug testified that he was watching the bark, and that a short time before the grounding a new hand took the wheel, after which she was badly steered and did not follow the tug.   *Held*, that the tug was liable for the loss, on the ground that the master was presumed to know the existence of the obstructions, and that it was his duty to warn the bark of the danger, if she was not properly steered; also, because he failed to exercise proper care and skill in releasing her after the grounding.

In Admiralty.   Suit against tug for loss of tow.

Walter G. Charlton, for libelants.

William Garrard, for respondent.

SPEER, District Judge.   John Swan and others, citizens of the states of New York, Maine, Pennsylvania, and Massachusetts, who were owners and proprietors of the bark Justine H. Ingersoll, have brought this libel against the steam tug Inca.

The libelants aver that on the 8th day of February, 1903, the bark, with a cargo of 373,000 feet of pine lumber, was lying at the Hilton-Dodge lumber mills on the Satilla river, in this state, and was ready to start on her voyage, via said river and St. Andrews Sound, to her destination, the city of New York.   The bark was in first-class condition and was properly manned and equipped.   The Satilla is a fresh-water stream, and a navigable river at the point where the bark was lying, having an ebb and flow of tide, with a rise of about 6 feet, and with sufficient draft to float such a vessel as the Ingersoll in safety.   It empties into the St. Andrews Sound on the coast of Georgia, about 30 miles below the point where the bark lay ready for her voyage.   When loaded the Ingersoll drew 17 feet 3 inches aft and 16 feet 6 inches forward, and, whilst the master had been advised by "outsiders" that he had best start on a two-thirds flood, he had no knowledge of the river, its depths, or its channel.   It was, therefore, essential for him to employ the assist-

ance of a tug, and to rely on the judgment and direction of the master of the tug, in order to get his vessel out of the river. To obtain this assistance he telegraphed to the agents of the tug that he desired its services to take the bark to sea, and in response to this request the Inca came, and arrived where the Ingersoll was lying at 11 o'clock in the forenoon. The tug was employed. At the hour of her arrival the tide was still running down, and in the judgment of the master of the tug it was not expedient to take the bark down on that stage of the tide. At 1 o'clock in the afternoon, the tide having turned about noon, the master of the tug announced to the master of the bark that he was ready to start, whereupon the master of the bark remonstrated, stating that he had been informed that it was not safe to take a vessel of her draft down the river on a young flood, but that the voyage should be delayed until the tide was two-thirds flood. Whereupon the master of the tug said that his informant was a fool and knew nothing about it, that he himself knew his business, and that it was entirely safe for the bark to be towed down the river at that stage of the tide. The master of the bark, having no personal knowledge of the conditions, and relying upon the assertion of the master of the tug, permitted the bark to be taken in tow, and began the voyage at 1 o'clock in the afternoon of that date. It is further alleged that, in towing the bark, the tug was about 200 feet ahead; there was a man at the wheel of the bark, steering as nearly as possible in the wake of the tug; and all went well until a point between half a mile and a mile from the place of starting was reached, when the bark, in thus following the tug and being thus drawn by her, was run upon sunken rocks, of which the master and crew of the bark had no knowledge, and of which the master of the tug either knew or ought to have known. The bark struck her bottom near the foot of the mizzenmast, and stuck on the rock. Whereupon the master of the tug, failing in the effort to pull the bark ahead off the rock, let her swing with the tide, and attempted to twist her off, during which process her rudder sprung up. The master of the bark then requested him to bring the tug alongside and pull her off straight, which he refused to do. He continued twisting her three times, until her rudder came up, and the bark, in coming off the rock, tore off her shoe, and was otherwise so injured that she filled in about 10 minutes and sank. The master of the bark endeavored to get her on the bank of the river, so as to avoid sinking in the channel, to this end letting go her port bow anchor and letting her stream anchor go astern, which was all he could do. It was alleged that the master of the Inca failed to exercise ordinary and reasonable care, caution, and maritime skill, first in towing the bark at the stage of the tide then existing, then in getting the bark aground, and in the method adopted in getting the bark off of said obstruction. By this negligence and want of skill the bark was wrecked and became practically a total loss to the owners. A survey was held upon the bark, after sinking, and, as repairs would have cost $10,000, it was recommended by the board of surveyors that she be sold as she lay, which sale being had, the highest price bid for her tackle, apparel, and furniture was $725, for which sum she was sold. Libelant alleges that he has been endamaged in the sum of $12,200, whereof $10,000 represents the value of the bark, her apparel, tackle,

and furniture at the time of her destruction, less the sum of $725, for which she was sold, and the sum of $2,500 represents the net freight upon the cargo being transported in the bark at the time she was sunk, and which was also lost, for all of which damages the representatives of the steam tug decline to settle with libelants.

Upon these averments, with suitable prayers, process issued, was served, and an answer was filed by the claimant of the Inca. The claimant is the South Atlantic Towing Company, a corporation of the state of Georgia.

The answer admits that the bark was lying at the spot alleged, and that she was well equipped and manned, but whether staunch or not they neither admit nor deny. They allege that the master of the bark was Christopher Edwards, a negro, and that the bark was an old vessel, about 27 years old, and was not in condition, as respondent is informed and believes, to be insured; that the place at which she was lying was an exceedingly dangerous one, because there was a large number of logs lying at the bottom of the river, and with said bark loaded down as deeply as she was, at low tide, her keel rested on these logs, occasioning serious danger of injury thereto and to her hull. The answer states, at the time mentioned in the libel, when she was ready to begin her voyage down the Satilla river, she had been pulled out from her dock and lay out in the stream afloat. It is admitted that the Satilla river was navigable, and had a sufficient depth to float in safety a vessel of the draft of the bark, and says the bark, according to the marks on her stern, drew 17 feet 7 inches aft and 16 feet 10 inches forward. It admits that it was necessary for the bark to employ a steam tug, and under the form of an admission avers that it was necessary for the bark to follow in the wake of the tug, and to be herself steered properly. The answer further admits that at 11 o'clock and 25 minutes the water in the river was still running down, although the tide had been rising since about 11 o'clock, and that it was not expedient, in the judgment of the master of the tug, to take the bark down the river on that stage of the tide. The respondent admits that about 1 o'clock the tug master announced to the master of the bark that he was ready to take her down the river, but denies any remonstrance on the part of the bark's master, and any such conversation on this subject, as that alleged in the libel. The answer then sets forth that it was high tide at St. Andrews Sound on February 8, 1903, at 9 minutes past 4 o'clock p. m., which would have made it high water at the lower bluff mills, where the bark was lying, at about 5 o'clock p. m.; that it was low water at the said mills at about 11 a. m.; that thereafter the flood tide began at that point, occasioning a rise in the river for about an hour and a half, the water in said river during the said period of an hour and a half running down still, and at 12 o'clock at said mill on said day the flood tide had counteracted the flow of the water in the river, and then the flood tide was running up, and after said last-named hour the said flood tide was running up strong; that it was 1:45 p. m. when the tug got the bark and started down the river; and that the tide then was running very strong flood, with a depth of water in the channel of 24 feet. In the judgment of the master of the tug it was best to leave at that stage of the tide, so as to get to the shoals

lower down the Satilla river about high water. These shoals bear the profane designation of "Pull and Bedam," and are located 12 miles below; there being others, known as "Floyd Shoals," about 3 miles further down, and it being the design of the master of the tug to reach the last-named shoals about high water. There was plenty of water in the river above the shoals first mentioned, and by going down the river on that stage of the flood he would be enabled to get his tow safely across the shoals at high water. The answer insists that the tug was 360 feet ahead of the bark, instead of 200 feet, as alleged. It admits the bark had a man at the wheel, but denies that it was steered as nearly as possible in the wake of the tug. It admits that the bark went aground between a half a mile and a mile from the place of starting, but denies she went aground in following the tug, or that the tug drew the bark in such a way as to put her aground. The respondent does not know whether the bark ran upon a sunken rock or not, and alleges that, whether there was a rock there or not, the master of the tug neither knew nor should have known, because the same was entirely out of the channel, and in a bend of the river outside of the fairway, and the bark went aground by her own gross negligence. It is admitted that the tug made strenuous efforts to pull the bark off the obstruction, whatever it was, and failed to do so, but denies that the master let the bark swing with the tide, and then attempted to twist her off the rock, and denies that the master of the bark requested the tug to come alongside and pull her off straight, and that he refused to do so, and also the allegation that the tug twisted the bark three times until her rudder came up, but admits that, when she was finally pulled off, she filled rapidly and sank. It is alleged that the bark was out of the channel at least 120 feet.

The theory presented of the bark's misadventure by the tugboat is as follows: The Inca took the Ingersoll's hawser, which was about 60 fathoms in length, or about 360 feet; the said hawser being made fast on the bark to her port bow, and being made fast at the stern of the tug on her starboard bitts, which would have put the bark, in following the tug, with her port side in the wake of the starboard side of the tug. The bark was sharply built and easily steered, and should have been kept in the wake of the tug. The tug was in the command of Capt. Floyd, an experienced master, a licensed pilot, and entirely familiar with the Satilla river from the lower bluff mills to St. Andrews Sound. The voyage began at the proper time and stage of the tide, and for 6 miles there was a clear unobstructed depth in the channel of 24 feet; the channel being broad and ample, with no short bends in the river. When the bark started, it is alleged, her master was at the helm, and she proceeded a short distance when the master gave up the helm to one of his sailors, walking forward to the break of the poop, where he ought not to have been. His proper position, during the time of the progress of this vessel down, was at or near the helm, so that he might give direction as to the course of the vessel in keeping her in the wake of the tug. This was especially necessary, as there was a gradual bend in the river ahead, which the tug and tow were about to make. The channel was on the starboard side of the river going down. It was about 200 feet wide with a depth of 24 feet. About a quarter of a mile below the mills a gradual bend in the river set in, extending about half a mile.

The tug kept near the starboard shore, which required the bark to do the same; but, instead of doing this, the bark was steered with such gross carelessness and negligence that she was allowed to go off to port a distance of three times her width, thus throwing her out into the bight, and entirely out of the channel. The wheel ought to have been put to port, so as to keep the bark in the tug's wake; but, instead of this, the wheel was left alone and neglected, and consequently the bark immediately went out of her course, and did not come around as quickly as she would have done with her wheel to port, and the bark therefore went rapidly into the bight, and brought up on some obstruction which was entirely out of the channel, the nature of such obstruction not being known to the master of the tug or the respondent. So far as that part of the river was concerned, for six miles the bark could have been towed in perfect safety at any stage of the tide. It is further alleged in the answer that when the bark hauled up on the obstruction, whatever it was, the headway of the tug was stopped, and the master of the tug then knew the tow was aground. Thereupon the tug endeavored to pull the tow off, and failed in the first effort. The bark remained fast; the tide carrying her bow around to starboard, until she headed about across stream. Then the master of the tug, finding the tide was carrying the tow around, slowed the tug up and waited for the tide to rise, trusting to get her off with the aid of the tide. After waiting about 15 minutes the tug began a second time to pull the tow off, and after pulling for about 10 minutes, and finding she did not move, again slowed up to wait for the tide to rise. After waiting about 15 minutes more, the tug then proceeded the third time in her attempt to pull the tow off the obstruction, and succeeded. The bark was then towed down stream about five times her own length, when the mate of the bark sung out she was sinking. The master of the tug immediately starboarded his wheel, and put the tug over to the port shore, so as to ground the bark at or near shore as quickly as possible. The bark where she lay was full of water; the depth being four fathoms. The master and crew were on the poop deck of the vessel, which was about five feet above the water. It was about five minutes from the time the bark was pulled off the obstruction until she sank. Having done all that could be done, the tug took her departure for Brunswick. It is averred that the man at the wheel was a common sailor, with neither captain nor mate at hand to correct him. It is denied that the tug was unskillfully or negligently managed. It is alleged that all was done by the tug which could have been done to get her off the obstruction, and that the master of the tug acted with reasonable care, caution, and skill, denying all negligence and want of maritime skill. The answer alleges that the bark was wrecked and sunk solely on account of the gross carelessness and want of skill of her master and officers and crew.

The foregoing statement we think adequately presents the issues in controversy before the court. It is not in serious dispute that the bark was in all respects staunch and sound when, loaded with her cargo of lumber, she was lying in the Satilla river, awaiting the tug at the mills of the Hilton-Dodge Lumber Company. There is no proof whatever that her bottom had been damaged by supposititious logs, which might have been imbedded in the bottom of the stream. That she floated there

for days, and floated in the stream awaiting the tug, and floated in safety while going down the stream, until she grounded on the obstruction and sunk in five minutes after she was pulled off, makes it clear that her loss was due to such grounding, and to no other cause. Indeed, this ground of defense was not noticed by the proctor for respondent in his argument. Beginning, then, with the assumption that the loss of the Ingersoll, while in tow of the tug Inca and under the domination of her master, is plainly ascribable to the grounding, it becomes important to briefly state the law controlling in conditions like those under consideration.

In The Margaret, 94 U. S. 494, 24 L. Ed. 146, where a brig in charge of a tug did not answer her helm, the port line broke, and the starboard line broke also, and the brig was thrown by the force of the swell upon the end of a pier, a hole was stove in her quarter, and she sunk, where it was not denied that in the crisis the tug did all that could be done to relieve her from the perils of the situation, the Supreme Court, through Mr. Justice Swayne, observe:

"The tug was the dominant mind and will in the adventure. It was the duty of the brig to follow her guidance, to keep as far as possible in her wake, and to conform to her directions. The exercise of reasonable skill and care within this sphere was incumbent on the tow. It does not appear that there was a failure in any of these particulars. If the port line was too weak, the tug should have called attention to it. Silence was a fault. The tug was not a common carrier, and the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences."

The court continue:

"The port of Racine was the home port of the tug. She was bound to know the channel, how to reach it, and whether, in the state of the wind and water, it was safe and proper to make the attempt to come in with her tow. If it were not, she should have advised waiting for a more favorable condition of things. She gave no note of warning."

It is true that in that case no serious attempt was made to inculcate the tow.

Another pertinent principle is stated in Hughes on Admiralty, par. 60, and is fully supported by authority:

"It is also settled that the mere occurrence of an accident raises no presumption against the tug, and that the burden is on the complaining party to prove a lack of ordinary care. At the same time, the ordinary care required of those engaged in the profession of towing is a high one, for they hold themselves out as experts. The measure of care required is similar to that required of pilots. In fact, they are pilots."

In the case of Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477, the Supreme Court, through Mr. Justice Hunt, say:

"As a necessary incident of this engagement [towage of a barge], the defendants were entitled and were bound to assume supreme control and direction of the plaintiff's boat, and of the persons in charge of her, so far as was necessary to enable them to fulfill their engagement, and they were bound to

exercise such degree of diligence and care as a prudent and skillful perform-ance of the service for which they stipulated would require."

And again:

"As an expert, a tugboat man must know the channel and its usual currents and dangers. * * * He is liable for striking upon obstructions or rocks in the channel which ought to be known to men experienced in its navigation, but not for those which are unknown." Hughes on Admiralty, § 60.

These are established, and must control the court.

It is averred in the answer of the respondents in this case that the master of the tugboat had an experience of 15 years as pilot. This averment is irrelevant, if it did not mean that he was a pilot on the Satilla. His own testimony is that he was in and out there, towing vessels, frequently. It was with him a regular duty. If there was a sunken obstruction upon which such a tow as the Ingersoll might ground, unless it was wholly unknown to pilots familiar with that stream, he is chargeable with notice of its existence, and several pilots testified that they knew of the existence of this obstruction. The ob-struction had been there for many years, and the information of its presence was handed down from father to son. It was caused by small vessels which formerly came to that river dumping their ballast of stones, and there was a number of mounds thus made in a line along that side of the channel. This was the testimony of the Faders, father and son, who had been pilots on that stream for many years. Capt. White, the master of the passenger steamboat Falcon, also knew of this dan-ger to navigation, and stated that the elder Fader had told him about it. It was within a quarter of a mile of the mill of the Hilton-Dodge Lumber Company, where many vessels are loaded, many of them in-trusted to the master of the Inca. He is therefore bound by the law to have known of its existence, and to have warned the master of the bark; and, if he saw any evidence of improper or dangerous steering of his tow with regard to this hidden danger to navigation, he was bound to warn the master of the tow to steer clear of it. In such a crisis, in the language of the Supreme Court in The Margaret, "silence was a fault."

If the testimony of the master of the tug and one of the principal witnesses for the respondent, a Mr. Ray, is true, such a warning was demanded. From the tug both Ray and Floyd, as they state, were watching the tow and commenting on the skillful steering by which she was kept in the wake of the tug. At this moment, as they were reaching the bend, according to their statement, the captain surrendered the helm to a seaman, and Capt Floyd of the tug exclaimed, "Look at the difference now!" Then both declared that the bark began to steer wildly. The captain of the tug testified that it began to "wobble all about." At that moment, taking his own statement as true, the duty of warning from him was imperative. This was especially true when he knew that there was no pilot on the tow, and when it appears that neither the master nor any of her crew were familiar with the river or its dangers. If by timely measures of precaution the danger could have been avoided, the master of the towboat will not be excused. The Syracuse, 12 Wall. 172, 20 L. Ed. 382. When towage is voluntarily attempted in dangerous and perilous places, the tug must exercise skill

and care commensurate with the peril it assumes to encounter. The Adelia, 1 Fed. Cas. No. 79 (decision by District Judge Fox, in Maine). In that case, while the tug master, doing the best he could, with full knowledge of the danger, through error of judgment permitted his tow to go on the rocks, the tug was held liable. It is true, as held in the case of The Stranger, 23 Fed. Cas. 220, No. 13,525, where the tow takes a sudden and unexpected sheer into danger, the tug is not liable; but it is not so clear, if the tow, with no pilot on board, is permitted to sag off to one side or the other into a danger of which the master of the tug has knowledge, that in the absence of warning the tug would not be liable. In the case of the The Stranger, supra, commenting on the case of The Angelina Corning, 1 Fed. Cas. 910, No. 384, the learned judge remarks:

"It is very easy to see how a tug, knowing of the existence and location of a sunken rock, should be held responsible for running a tow upon such a rock, in consequence of a change of course resulting in the sagging or hanging off of the tow in such a way as to bring her upon the rock. In that case the tug would be in fault by not having made due allowance for the sagging of the tow in consequence of the change of course, which is very different from a case of sheering of the tow solely on her own account."

It seems, also, to be clearly settled that a tug, undertaking to tow a vessel in navigable waters, is bound to know the proper and accustomed waterways and channels, the depth of water, and the nature and formation of the bottom, whether in its natural state or as changed by permanent excavations. When all these conditions as they exist admit of safe towage, the tug is responsible for any negligence to observe them and be guided thereby. The Florence (D. C.) 88 Fed. 302; The Henry Chapel (D. C.) 10 Fed. 778; The Effie J. Simmons (D. C.) 6 Fed. 639; The Robert H. Burnett (D. C.) 30 Fed. 214. In The Robert H. Burnett, supra, the court held that the admission of the captain of the tug that he had no knowledge of the rock and had never heard of the reef showed ignorance of a notorious fact and left him without excuse.

From these legal considerations it seems clear that, if we confine our attention solely to the testimony of the master of the tug, as it relates to the critical moment, and the diagram or chart of the river put in evidence by respondent, there can be little doubt as to its liability.

It appeared from the evidence that at the time of the misadventure she was going ahead with all her power. Taking the diagram as true, in connection with the testimony of Floyd, we discover these facts: The river is 375 or 390 feet wide at the point where the Ingersoll grounded. This was on the port side of the vessel, and on the left-hand side of the river. The channel was 200 feet wide. According to the testimony of Floyd the obstruction which caused the loss of the vessel was 60 feet to the left-hand edge of the channel. The bark was 142 feet long and 40 feet wide, and it is safe to conclude that, if all Floyd said was true, around the natural sweep of the tow at the end of a hawser 300 feet long would have carried the tow to the point where she struck. There were peculiar reasons, therefore, why the tow should have received the most careful instructions to avoid this danger. There was at least 24 feet of water everywhere in that neighborhood, except on these ballast mounds. Besides, the master of the tug must have known that, while

she was going around the bend, the strong flood tide, striking the tow on the starboard bow, would have a tendency to bear her off to port and on these obstructions. That she was wobbling, and that she was following her own course, Floyd testifies. It does not appear, nor is it pretended, that any caution was given by any one aboard the tug. It appears, moreover, that she did not strike the obstruction with her stem, and as she went out of the way only 60 feet from the edge of the channel, and came up on the rocks under the mizzenmast, the probabilities are very strong, if Floyd's testimony is true, that her sagging or divergence from the channel was due to the curve in the river and the force of the tide, and not to any fault or misconduct on the part of the tow. All of these conditions were vital to the safety of his tow, and, if the tug and bark pursued the course indicated by Floyd, the tug would seem liable because the master of the tow was not warned of the danger. The master had as little knowledge of the width of the channel as of the presence of the sunken rocks or the force of the tide at that point.

But, if the testimony of the officers and the available members of the crew of the Ingersoll can be accepted, the facts illustrate conduct on her part far more inculpatory. Not only does it appear from this evidence that, after having been warned, the master of the tug started the voyage at a dangerous stage of the tide, but that he kept down the left side of the river, and dragged the bark directly on the ballast mounds. When notified by the cries from the tow that the bark was aground, he slacked the hawser, and she floated. He then started ahead again, and dragged her further up on the mound, where she stuck. It is then contended by the libelants that, instead of waiting for the rise of the tide, which in a little while would certainly have floated her, notwithstanding the protests of the master of the tow, who cried out that he was damaging the tow, Floyd tried to "twist" her off by alternately slacking, or slowing down, and then going ahead at full speed. His own testimony on this subject is exceedingly injurious to his side of the case. He said:

"I pulled her just as hard as we could pull her, right straight down the river. I kept her as near heading down the river all the time as it was possible for me to do with my boat."

He was asked:

"How far starboard did the tide swing the vessel? A. It swung the vessel until she headed almost across the river."

This was when her bottom was on the rock. He continued:

"When the vessel swung, it carried the tug around with her, pulling all we could pull. The tide carried the vessel's bow right around after her, so as to be nearly about across the river. After the vessel had swung around as far as she was going, I held up pulling for a few minutes. Q. For what purpose did you stop? A. I did not want the vessel to swing any further. Q. You waited a few minutes? A. After I found that the vessel had stopped swinging, I slowed the boat down a little; gave one bell. I waited for about ten minutes. Then I what we call 'hooked' her up again; that is, rang the jingle bell, and that pulled the vessel's head down the river then about a point and a half or maybe two points, not over two points. I found she was not going any further. I slowed the boat down again and waited about 15 minutes, and then I hooked the boat up again, and the vessel jumped right off"

the obstruction—just slid off, and swung around behind the boat, and you could see the vessel settling down in the water.  Q. She sunk immediately?  A. Yes, sir."

Now it does not seem difficult to discover bad judgment from these facts.  It is not difficult to account for the injury to the Ingersoll, which caused her to sink in five minutes.  It is plain that her bottom under the mizzenmast was ground into nothingness by the alternate action resulting from pulling with full speed and slowing up on the part of the tug.  It will be observed that the hawser from the tug was attached to the port bow of the Ingersoll.  The Ingersoll was grounded near her stern.  She was not so fastened, however, but that the tide readily swung her up stream.  The resistance of her full length was offered to the tide when the tug would slow up pulling.  This would make her swing with the tide, and, when it would go ahead at full speed, superadd to the power of the tug the power of a mighty lever to be found in the bark 142 feet long, which was constituted by the hull of the ship.  This would impart a reverse action.  It is probable that there are not many wooden vessels which could have long withstood this grinding movement, and when, in a few moments, the tide had risen sufficiently to float her, she immediately sank.  It is true that a number of witnesses from Brunswick, where the tug is owned, testified that this was the proper way to get the tow off; but two or more were stockholders in the defendant company, and the court does not feel obliged, on account of expert testimony of this sort, to disregard what seems the obvious inferences, even from the evidence of Floyd.  Since subsequent soundings, also made by Floyd, at the equivalent stage of the tide, found 17 feet of water on this mound, it does not admit of a doubt that an exhibition of a half hour's patience would have floated the bark off without any damage.  It may have been desirable on his part to make haste in order to cross the shoals below; but it was much better to lose a tide than to lose a ship.  The vessel, while old, was strong and staunch.  She had just been repaired.  Mr. John Swan, one of the owners, who appeared, and who evidently, from his appearance, is a man of intelligence, testified that she had been recently repaired at a cost of $5,000.  The voyage preceding that on which she was lost had been to Porto Rico with a valuable cargo, much of it refined sugar.  There was no evidence whatever as to her unsoundness, except that some of the shoe which floated up after the wreck had been pierced by the toredo.  This did not affect her hull or her staunchness.  Certain, it is true, the burden of proof is on the respondent to show she was unseaworthy, and no such proof was offered, save the fact with regard to a portion of her shoe, as just stated.

An attentive consideration of the evidence satisfies the court that, notwithstanding the irreconcilable conflicts in the evidence, the testimony of the witnesses for the libelant is entitled to credence.  Capt. Christopher Edwards appeared and testified orally, and seemed to be telling the truth.  The testimony of the master of the tug seems incredible.  He testified that nobody on the bark sung out, or gave any call to him for help, in all the time the bark was fast.  In view of the imminent peril of the bark, the fact that she was aground for nearly a half hour, the contradictions by the libelants, and the utter improbability of this

statement, it is wholly disregarded by the court, and throws the gravest doubt on all the testimony of Floyd.

It is alleged in the libel, for what reason in law the court cannot divine, that this witness Edwards is a negro. He does not appear to be a negro. But, if this was important, no witness testified that he was a negro. On the other hand, the cook of the bark testified that the master of the tug was himself a negro. He is as little like a negro as Capt. Christopher. It appears, then, that, so far as the race question is involved, the evidence does not preponderate either for the libelant or respondent.

A decree will be ordered adjudging the respondents liable for the full value of the Ingersoll, together with the freight charges lost, less the price for which she sold, and a reference to the master will be directed to ascertain and report the sum of such damages.