## THE MARIE PALMER.

### THE EDGAR F. CONEY.

(District Court, E. D. Georgia, S. D. September 30, 1911.)

1. TOWAGE (§ 11*)—DUTIES OF TUG TO TOW—OBLIGATION TO EXERCISE SKILL AND CARE.

While the owner of a towing vessel does not insure against marine perils, he is bound to the exercise of that degree of care and skill which navigators of prudence usually employ in such service, and is bound to know the waters, the channels, and well-defined currents, and such well-defined shoals as have been for a sufficient length of time marked by the government, and all other dangers known generally to men experienced in navigation.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11-23; Dec. Dig. § 11.*]

2. TOWAGE (§ 15*)—STRANDING OF TOW—EVIDENCE OF TUG'S NEGLIGENCE.

The fact alone of the stranding of a tow on a well-known shoal may afford strong presumptive evidence of fault on the part of the tug.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 34; Dec. Dig. § 15.*]

3. TOWAGE (§ 11*)—STRANDING OF TOW—NEGLIGENCE OF TUG.

The four-masted schooner Marie Palmer, bound from a northern port to Savannah with cargo, encountered heavy weather off Hatteras, and put in to a North Carolina port, where it was found by a board of survey that she was leaking, but could proceed under tow, and respondent's tug was employed to take her to Savannah for an agreed price. The vessels started on a clear day with a light breeze, and had proceeded 85 miles, when, shortly after dark, the schooner stranded on Frying Pan Shoals, and became a total loss. These shoals are among the best known and most dangerous on the Atlantic coast, and their position is indicated by lights maintained by the government. The vessels should have gone to the eastward of the Cape Fear gas buoy, which showed a light every alternate five seconds, but the stranding occurred 4½ miles to the westward of it. The schooner, which had taken soundings, a short time before hailed the tug, and asked if they were not too far in shore, but was answered that they were going all right. There was a deviation in the compass of the tug, and the card for its correction was not at hand, nor were any observations taken of the lights. The navigators apparently mistook the Cape Fear light 14 miles to the westward and 159 feet high, for the gas buoy, the light on which was different, and only 18 feet above the water. *Held*, that they failed to exercise proper skill and care, and that the tug was liable for the loss of the tow.

[Ed. Note.—For other cases, see Towage, Dec. Dig. § 11.*]

4. SHIPPING (§ 208*)—LIMITATION OF OWNER'S LIABILITY—PRIVITY OF OWNER.

The legislation of Congress for the limitation of liability of shipowners should be construed liberally for their protection, and the fact that the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

master of a tug, through whose fault a tow was stranded and lost, was a director in the corporation owner, is not in itself sufficient to establish the privity of the owner in such sense as to deprive it of the right to limit its liability under the statute.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 208.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

In Admiralty. Suit by Arthur C. Chaney, as master of the schooner Marie Palmer, against the tug Edgar F. Coney, South Atlantic Towing Company, claimant, American Agricultural Chemical Company, intervener. By an amendment to the answer, claimant presented a petition for limitation of liability. Decree for libelant and intervener and granting the petition for limitation of liability.

Howard M. Long, for libelants.
Edward E. Blodgett, for cargo owner.
J. P. K. Bryan and Jos. W. Bennet, for claimant.

SPEER, District Judge. On the 1st of December, 1909, the schooner Marie Palmer was stranded upon the Frying Pan Shoals, near Cape Fear, on the coast of North Carolina. The schooner had four masts, and had a carrying capacity of about 3,100 tons. She was nine years old, and was owned in New England by William F. Palmer and others. In the month previous to the accident, she had been docked at Perth Amboy, N. J., and was put in good order. She was caulked thoroughly, and, after caulking, the seams were cemented. She was then classed as "A 1." Taken off the dry docks, she was immediately brought to Cartaret, N. J., and was loaded with a little more than 2,600 tons of fertilizer in bulk and 34 tons of empty bags for a voyage to Savannah. She was under the command of Capt. Arthur C. Chaney, a competent and qualified master. He and his father owned two sixty-fourths interest in the vessel. On her voyage near the Virginia capes, the schooner encountered very heavy weather. When off Cape Hatteras, Capt. Chaney found that some of the fertilizer in the cargo had been carried down by the waves taken aboard in such manner as to choke all of the pumps save one. The schooner had auxiliary steam power to work the pumps and for other purposes. She had three pumps, two of the six-inch and one two-inch suction. Only the latter could be worked when the schooner, on account of threatening conditions, sought a harbor in Lookout Bight, near Beaufort, N. C. This was done to clear her pumps, and have an official survey made of the cargo from the conditions brought about by the storm. The report of the surveyors is in evidence. The surveyors found, as appears from their report, that the schooner was leaking four inches an hour, and should be towed to her port of destination. The tug Edgar F. Coney of Brunswick, Ga., was at the time lying in the harbor of Norfolk, Va., and she was engaged to tow the schooner from Lookout Bight to Savannah for the sum of $525.

The Palmer and the Coney were old acquaintances, as was Capt. Lomm, the master of the Coney, and Capt. Chaney, the master of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Palmer. The evidence strongly preponderates to show that, when the Coney arrived alongside of the Palmer, Capt. Chaney explained to Capt. Lomm why towage was necessary. There can be no fair doubt on this subject. On the morning of December 1st the Coney, having taken the Palmer in tow at a point north of Wilmington, and about 10 miles south of Cape Lookout, proceeded on her voyage. The weather was most propitious. The day was clear. There was a breeze of eight miles an hour from the northwest following the Coney and her tow. Several sails were set on the schooner at the request of the officers in command of the tug. All of these conditions continued. About half past 6 o'clock in the evening, according to the time kept by the tug (Central time), and about half past 7 by the schooner's time (Eastern time), the Palmer was towed aground on Frying Pan Shoals, one of the most familiar shoals of that dangerous coast. The fine weather continued that night, and the next day, but in a very few hours, notwithstanding the efforts on the part of the Coney, and other tug boats, and a United States revenue cutter, the Marie Palmer was a complete wreck. Under the circumstances it could not have been otherwise. After the stranding on a shoal so exposed, the Palmer was exposed to the full force of the sea, and the sands along that coast have been more than once judicially held to be of the most treacherous character. The fate of the United States sloop of war Huron, wrecked to the northward, and the City of Savannah, to the southward, and many other ill-fated vessels, have demonstrated that not only is the stranded vessel ordinarily lost, but that it soon sinks in the sand and disappears from sight. See the Agnes I. Grace (D. C.) 49 Fed. 662. Indeed, these and the contiguous waters have been called the "graveyard of the Atlantic."

During the voyage the Coney was commanded by Capt. Lomm, her master. He had no license as such north of Wilmington, and in the waters where the Palmer was towed aground. He was, however, assisted by Capt. Myers, who was a licensed master and Atlantic coast pilot. It appears from the evidence that Capt. Myers laid the course. The tow was started at 6:50 a. m. Myers then went to breakfast and Capt. Lomm took command, and remained in charge until after 11:20 a. m. At this time Myers came on deck, took an observation, and endeavored to locate the position of the tug and the schooner. There was no chronometer aboard the tug, and after ascertaining the latitude, in order to take the longitude, Capt. Myers resorted to the lead. He got 15 fathoms of water. There were no other soundings taken until after the schooner had been towed aground, although immediately thereafter Capt. Lomm ordered soundings to be taken. Until 1:30 p. m. the tug had been steering S. W. ¾ S., according to the tug's compass. It was, however, shown that there was considerable deviation in the compass of the tug. The card showing the deviation was not where the pilot, quartermaster, or helmsman could see it, but was locked up elsewhere. Capt. Myers had charge of the navigation of the tug from 1:30 p. m. until 6 p. m. in the evening, Central time, when Capt. Lomm again took charge. Myers went below, and Lomm remained in charge until after the schooner was stranded. This was at

6:50 p. m. according to the tug's time, and 7:50 p. m. according to the time of the schooner. This appears from the report of Capt. Myers as coast pilot to the United States steamboat inspectors, at Jacksonville, Fla. Capt. Myers stated that he regretted to report that he "got the Marie Palmer aground on Frying Pan Shoals."

While there were no soundings taken on board the tug, except as above mentioned, the officers of the schooner did not omit a duty so imperative in these waters. It is not in dispute that a short time before the schooner grounded the second mate of the schooner, under orders from Capt. Chaney, was sounding, and got eight fathoms of water. This was at once reported to Capt. Chaney of the schooner, who called the first mate and instructed him to hail the tug's captain, and tell him that he was getting the schooner too close to the land. The schooner's witnesses fix this incident at 20 minutes and the tug's witnesses at 10 minutes before the stranding. The witnesses for the Palmer testified that the first mate hailed the tug, and called to Capt. Lomm, "You are taking us too near the land," to which Capt. Lomm replied, "We are going all right." This, the libelant's witnesses state, was all of the conversation. On the other hand, the witnesses for the tug testify: That the mate hailed Capt. Lomm and asked, "Are you not taking us too close to land?" To which Capt. Lomm replied: "We are going all right. The chart gives us plenty of water. Don't you see the buoy on our starboard side?" That the officers of the schooner replied, "We do not see the buoy," to which Capt. Lomm said, "Don't you see the buoy?" and there was no reply from the schooner. Immediately after the conversation between the tug and the schooner, the second mate of the schooner sounded again, and got five fathoms of water, and, in order to make sure of the sounding, threw his lead, and, before he could get his sounding the second time, the schooner struck. It appears from the evidence that at no time thereafter, despite the efforts of the Coney and other tugs and a revenue cutter, the Seminole, was the schooner under control, or in any effective sense released from her hopeless position. The buoy to which the tug's witnesses referred was the Cape Fear gas buoy, at that time placed about 18½ miles in an easterly or southeasterly direction from Cape Fear Light. So dangerous are these waters that the government has established there the following aids to navigation: (1) The Cape Fear Light. This is a lighthouse on the upper end of Smith's Island, and is 159 feet in height. It is described in the government publications as a "flash light." It flashes every 10 seconds. (2) Cape Fear gas buoy, showing a light for five seconds, and eclipsed for the same period. It is anchored about 18½ miles from Cape Fear Light. The light of this buoy is about 18 feet above the surface of the water, and is illuminated by acetylene gas. It marks about the same spot which the Cape Fear lightship formerly occupied. (3) The Cape Fear light vessel. This is anchored about 11½ miles from the gas light buoy just described, and is therefore about 30 miles from the Cape Fear lighthouse. It shows two fixed lights for a distance of about 12 miles. It formerly occupied about the spot where the gas buoy is now placed, and was moved by the government in

1808 because of certain lumps which had been located to the seaward of the gas buoy. The government publications fix the visibility of the gas buoy at 8.85 miles.

It is plain from the testimony of the tug's witnesses that about one hour and twenty minutes before the stranding, at 5:30 p. m. Central time, Capts. Myers and Lomm had both sighted the light on the starboard side of the tug. This light they say flashed for five seconds, and was eclipsed for five seconds, and they concluded that this was the gas buoy. They, however, took no bearing of the light, but judged that it bore about three points off the starboard bow of the tug. Lomm and Myers both testified that this light was still visible to them at the time they replied to the hail of warning from the tug, and that they referred to it when they asked the schooner's officers if they did not see the gas buoy on the starboard side. It further appears that never on any previous occasion had Capt. Lomm or Capt. Myers seen the gas buoy. The night was spent by the tug in attempting to float the schooner. This failing, at Capt. Chaney's request, the tug took the latter to the life savings station on Smith's Island. Thence he went to Southport, N. C., to secure additional assistance to float the schooner. During his absence, the Seminole and the Coney pulled on the schooner, but she remain hard and fast aground, and all efforts to float her were soon abandoned. The next day the tugs Alexander Jones and Sea King came out, and stripped the schooner of her sails, rigging, ropes, and furniture. She was then abandoned. Capt. Chaney and his crew, with the material salved from the schooner, were taken to Wilmington, N. C. A subsequent effort was made to save the schooner, but she had gone to pieces on the shoals, entailing a total loss of the vessel and cargo.

For the loss of the Palmer the libel was filed, and the owners of the cargo have presented their claim by intervention. The testimony has been fully taken, a large part of it in the presence of the court, and the rest by depositions or by examining the witnesses before Hon. Paul E. Seabrook, acting as master in admiralty.

Proctors of the respective parties have been fully heard in oral arguments, and leave to file briefs was on application granted, but on account of the illness of Mr. J. P. Kennedy Bryan, one of the proctors for the claimants, his brief and certain additional evidence which he wished to submit did not reach the court until the 20th day of the present month. The answer of the claimant respondent denies that the schooner was seaworthy, or properly equipped, and insists that the contract of towage was induced by fraudulent concealment, namely, that the schooner was badly leaking and unseaworthy; that the schooner's pumps were so choked that they could not work at the time that she grounded on the 1st of December; that the master and crew of the tug continued in the work of salving the vessel until December 3d, when they were compelled to leave the schooner to save their own lives. The respondent admits that the stars were shining at the time of the stranding, that the wind was light, about eight miles an hour from the west northwest: that the course pursued was customary and usual; that, on account of the unseaworthy and leaky condition of the

schooner, she was constantly sheering, making it difficult for the tug to steer and keep her true course; that the tug was properly commanded and equipped, and that the course was proper and usual; that the course from Lookout Bight to Frying Pan Shoals was about 85 miles across the open sea and its variable and unknown currents; that about 5:30 p. m. Central time, as the tug with the tow approached Frying Pan Shoals, a light was seen on the starboard side; that the officers commanding the tug, in the execution of their best judgment and skill, determined that this was the Cape Fear shoals gas buoy, and, when a beam of light at 6:30 p. m., the course, which had been southwest by south since 1:30 p. m. was changed to southwest ¼ west by direction of the United States coast pilot navigator on board the tug (Capt. Myers); that at about 6:40 p. m. the captain of the schooner hailed the tug with a megaphone, and said, "Are you not pulling me too close in here?" whereupon the master of the tug answered, "No; the chart gives us plenty of water here. We have the gas buoy on our starboard beam. Don't you see the gas buoy?" The master of the schooner answered "he did not see any buoy." In answer thereupon the master of the tug again said, "Why, don't you see the gas buoy on our starboard beam?" to which the master of the schooner made no reply, and the tug continued its course, and the schooner followed the tug without further communication.

The answer continues:

"That the weather was hazy on the horizon. At about 6:50 p. m. (Central time of tug) the schooner suddenly grounded, and upon the grounding of the schooner suddenly the hawser parted. Thereafter the schooner blew several steam whistles, and the tug ran up close to the schooner, and told them to haul in the hawser, as it had parted close to the tug. After the hawser was got in by the tug, the tug continually pulled the schooner in an opposite direction to which it had gone aground, and succeeded in swinging the head of the vessel to the north and eastward. At times the schooner swung and moved ahead a little, but the tug was unable to relieve her that night because of the water in the schooner."

The answer contains much else alleged to have occurred after the stranding, which is not deemed material. There is a further complete denial of any fault whatever, unskillfulness, or negligence on the part of the tug, or its master, or Pilot Myers; that the officers of the tug used their best judgment and skill. It is further insisted that the stranding of the schooner was due to the willful negligence of its master, which was the proximate cause of the stranding and the loss of the schooner and the cargo, and that the concealment by the master and the owners of the true condition of the Marie Palmer, to wit, that she was leaking badly and her pumps choked, was a fraudulent concealment affecting the contract of towage, and was negligence, and was the proximate cause of the loss of the schooner.

There is an amendment to the answer, which presents the petition of the South Atlantic Towing Company for limited liability. In this it is alleged that the claim for damages will greatly exceed the value of the tug Coney, that the loss was without the privity or knowledge of petitioner (which is the owner), and that petitioner desires to claim the benefit of the limitation of liability according to the mari-

time law and the act of Congress made in such cases, and prescribed by the rules and practice of the court. Appraisers were appointed by the court, and they estimated the value of the Coney, her tackle, apparel, etc., at $25,000. Petitioner has given bond to pay into the registry of the court the sum of $25,000, the appraised value of the Coney, or such parts as the court shall direct. The right to limit the liability is resisted by libelants and the owners of the cargo for reasons which will be presently stated.

In determining the mooted question of liability, the court has been strongly impressed with the findings of many admiralty courts, noted as well for experience and distinction. These precedents have been considered in view of what is found on the part of the tug to be a simple, easy, and obvious duty of towage. The waters on which we witness the destruction of the schooner have received a peculiar and remarkable degree of attention from that beneficent bureau of the government affording aid to the mariner. This has been true for many years, and was doubtless particularly true during the four years of internecine war. The port of Wilmington was one of the first to be blockaded, and was the last to fall. The fleets of the nation for four years day and night patroled these waters. The charts in evidence indicate since then the most scrupulous attention and care upon the part of the government.

The weather was most propitious. The wind did not exceed eight miles an hour. It was directly astern, and was sufficient to fill the lower sails of the schooner, which were set at the request of the master of the tug. The evidence preponderates to show that there was no difficulty in towage, and no witness, either for the libelant or the respondent, testifies that any complaint of any such difficulty from either vessel was made pending the voyage. Almost the entire voyage of the tug and tow was made in the daylight. For many hours the commanding and widely known lighthouse on Smith's Island must have been in plain view from both vessels, and the master of the tug had only the duty of distinguishing the light on the gas buoy 18 feet high from the permanently fixed light on Cape Fear light tower 18 miles distant from the buoy. Instead of steering outside the buoy, which marked the outer line of the dangerous shoals, he directed his course four miles landward. It followed that he was soon stranded hopelessly on sands exposed to the full force of the Atlantic, and where the depth of the water was about three fathoms, or a little more than two-thirds the draft of his tow. In addition to this, it is incontestable that he had received express warning from 10 to 20 minutes before the Palmer went aground that the tug was off her course, and too near the land. With indifferent nonchalance, the master of the tug replied, "We are going all right. The chart gives us plenty of water. Don't you see the buoy on our starboard side?" The reply from the schooner, according to his own testimony, instantly came, "We do not see the buoy." The master of the tug saw what he conceived to be the gas buoy, but what he doubtless saw was a fixed light 14 miles to the starboard, the Cape Fear lighthouse. Capt. Chaney testified that from the deck of the schooner this had been seen and recognized for more

than an hour. The schooner, just before the alarm, sounded, and got eight fathoms. After the reply from the tug, again the lead was thrown from the schooner. The mate got five fathoms, and, to make sure, was throwing his lead again, but before he could get the sounding the schooner stranded. The gas buoy was 4½ miles to port. This the master of the tug did not see, and yet his proper course was to the seaward of the buoy. These facts in the opinion of the court are not in fair controversy. Certainly the evidence preponderates to produce the moral and inevitable conviction that they are true as stated, and are found to be true.

[1] Now, it is true that under a contract of towage the owner of the vessel towing does not insure against marine perils. It is true, however, that he must obey the law, and, in the protection of the life and property intrusted to his sole control, he must exercise that degree of caution and skill which navigators of prudence usually employ in such service. He is held bound to know the waters, the channels, well-defined currents, and such well-defined shoals as have been for a sufficient length of time marked by the government, and all other dangers known generally to men experienced in navigation; and he is bound to exercise such skill and knowledge for the protection of his tow. The Webb, 14 Wall. 406, 20 L. Ed. 774; Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Burlington, 137 U. S. 386, 11 Sup. Ct. 138, 34 L. Ed. 731; The Donaldson, 167 U. S. 599, 17 Sup. Ct. 951, 42 L. Ed. 292; Schuyler v. Tillyer (C. C.) 41 Fed. 477; The Inca (D. C.) 130 Fed. 36, subsequently affirmed by 5th Circuit, 148 Fed. 363, 78 C. C. A. 273; The Adelia, 1 Fed. Cas. No. 79; The Somers N. Smith (D. C.) 120 Fed. 569; Society, etc., v. Navigation Co. (D. C.) 178 Fed. 324.

[2] It is true that, under ordinary circumstances, damage to a vessel while being towed raises no presumption of fault on the part of the vessel towing; but, where the evidence preponderates to show such negligence, it may be found to exist, although no presumption is allowed in favor of the tow. It has, however, been held by the Supreme Court of the United States in The Webb, 14 Wall. 406, 414, 20 L. Ed. 774, that under certain circumstances, if a ship is towed upon a shoal, that the fact of stranding at such place would, in the absence of explanation

—"be almost conclusive evidence of unskillfulness or carelessness in the navigation of the tug. The place where the injury occurred would be considered in connection with the injury itself, and together they would very satisfactorily show a breach of the contract, if no excuse were given. At least they would be sufficient to cast upon the claimants of the tug the burden of establishing some excuse for the deviation from the usual and proper course."

See, also, Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270. In Burr v. Knickerbocker Steam Towage Co., 132 Fed. 248, 65 C. C. A. 554, Judge Brown, in delivering the opinion of the court, said:

"In order to prove negligence, it is not invariably necessary that the libelant shall show the specific details of negligence, or account for the exact manner in which the injury is inflicted."

Where two tugs were moving a steamer in the channel leading from the port of Buffalo to Lake Erie, and the steamship was stranded, Wallace, C. J., in rendering the opinion of the Circuit Court of Appeals for the Second Circuit, observes:

"It suffices that the misfortune occurred without any fault on the part of the tow, or on the part of the Babcock, and under a state of circumstances in which, if proper care is exercised in performing a similar service, such misfortune does not ordinarily occur. This was enough to impose upon the tugs the burden of proof to show that they had exercised due care. * * * This court has had frequent occasion to apply this doctrine in similar cases; the latest being the case of the Gennessee, 138 Fed. 549 [70 C. C. A. 673]."

The court adds:

"The proof offered by the tugs did not afford any explanation of the cause of the disaster, aside from the alleged disregard of orders by the tow. (There was no such disregard here.) No unforeseen difficulties were encountered, and no obstacle which the tugs were not bound to anticipate. The case is one where the stranding of the steamer created a presumption of negligence." The W. G. Mason, 142 Fed. 915, 74 C. C. A. 85.

In The Kalkaska, 107 Fed. 959, 962, 47 C. C. A. 100, 103, where a tug was towing three vessels on a hawser down Lake Superior, from Duluth, and the vessels stranded on a reef 17 miles out of their proper course, the Circuit Court of Appeals, Seventh Circuit, held that the burden rested upon the tug to show that she was supplied with a compass which was in proper condition, and that due care was exercised in navigation. The court observes:

"Here is a remarkable occurrence. In no storm, with the wind at no time exceeding 20 miles an hour, along a well-known coast, and in going a distance of not over 100 miles, the Kalkaska and her tows are at least 17 miles out of their course, and eventually each of the vessels strike the bottom, the Kalkaska and her tow, the Aloha, getting free, the latter in a leaky condition, and the other two tows are wrecked. The atmosphere, it is true, was filled with smoke from the burning woods of Michigan, but that fact neither accounts for nor excuses the disaster. To what cause can the stranding of these tows be attributed? It is urged on behalf of the Kalkaska that she was navigated with all prudence and skill, and that the disaster was caused by inevitable accident, and, as suggested by counsel, by some unknown current which imperceptibly carried these vessels upon the rocks. The circumstances of the case cast upon the Kalkaska 'the burden of establishing some excuse for the deviation from the usual and proper course.' The Webb, supra. It was, therefore, incumbent upon the steamer to show that she was supplied with fit and accurate compass, that her navigation was in all respects careful and prudent, and that the disaster could not have been avoided in the exercise of due care. A brief review of the manner of the navigation of the Kalkaska upon that day may furnish, possibly, a solution of the cause of the stranding. In the first place, we have no evidence of the condition of the ship's compass. It was incumbent, we think, upon the Kalkaska to show that she was furnished with such a compass as is ordinarily used, and that it was in due and proper condition."

[3] In the case now under consideration the compass of the tug was inaccurate. The card showing the deviation was not kept before the helmsman. The course was plainly marked and widely known. The tug and tow starting early in the morning proceeded, until the stranding, but 85 miles only. Frying Pan Shoals is not less widely known than any other on the coast. The captain of the tug, Myers, laid the course, as he testifies, for the buoy. He might have passed it in

safety anywhere within a mile to the landward, and, in a practical sense, anywhere to the seaward. He wrecked his tow 4½ miles to the landward of the buoy, and 13½ miles from the Cape Fear Light, which he may have mistaken for the buoy. There was no sudden exigency to divert the judgment. There was abounding opportunity to take the bearings of the lights, and to make soundings. The stranding itself occurred shortly after dark only, in the evening of a clear day, and shortly after the master of the tug had received from the master of the tow urgent and explicit warning of the danger. If under these conditions, as we find them to exist, there is no liability on the tug, which in obedience to the official finding of the surveyors was voluntarily towing the schooner to her port of destination for the agreed upon compensation, a case which would warrant a finding of liability for similar service or any default seems wholly inconceivable.

Nor does the most anxious consideration of the evidence and the contentions of the respondent's proctors afford any sufficient defensive explanation of the facts as they are found to exist. The contention of the respondent's proctor that the disaster resulted from a mere error of judgment on the part of the master or masters of the tug is wholly untenable. There was no room for error of judgment. Could it be conceivable that a navigating officer of the United States navy would be exonerated for running his ship on Frying Pan Shoals with no stress of storm or weather, no misleading accident, no necessity for an exigent, and therefore possibly an inaccurate, judgment, and especially when he had been warned of the danger in time to avoid it? Would a Savannah steamer be exonerated for the loss in the same waters of the lives of her passengers, or of her cargo, by a similar error with as little excuse? If this be true, the whole body of the maritime code of the United States and of other nations, skillfully drawn to prevent such catastrophes, would be inutile and worthless.

Equally ineffective is the plea that the master of the tug did not know the extremities to which the schooner had been reduced before he undertook the towage service. The Palmer was found storm bound, at anchor, in Lookout Bight. Had she been entirely seaworthy under her sail power, the contract to tow her would have been superfluous. These facts were known to the master of the tug. But, if this were not sufficient, that officer must have taken notice of the vital fact that her storm-tossed condition had been passed upon by an official board of survey, and that body, after careful examination, had found that she might proceed with her voyage under tow. It was optional with the captain of the tow boat to accept that finding, and take the tow. Certainly it put him upon notice of inquiry, and he did not hesitate to take the tow as in the condition in which the board of survey found her. In addition to this, all of the evidence preponderates to show that in her condition she was easily towable. The pretense, for from the evidence it is nothing less, that she dragged the tug four miles out of her course by sheering, on account of the immense volume of shifting water in her hold, cannot be for a moment accepted. There was little room in her hold for water. She was filled with a cargo which would have absorbed water until she sank. For the same rea-

son the water could not have sloshed fore and aft and athwartship as contended. The fact is that she floated, and was towed readily for 85 miles. There was no sign of sinking. Her large sail power in use all day long aided . the tow, and steadied the schooner, and would have prevented sheering. And, more conclusive than all, there was no complaint as to her condition from the tug, and no accident to the schooner herself until she was at 6:50 in the evening pulled by the tug on a sand bank where the depth of water was little more than two-thirds of her draught.

The contention that the light of the gas buoy was extinguished is merely a surmise. The officials in charge of it are presumed to have done their duty, and to have kept it lighted. Capt. Chaney and three other witnesses on the schooner testified positively that they saw it burning to the seaward of the schooner on the night of her stranding. The report of the keeper of the lighthouse is in evidence. He also testified as a witness. The report and his testimony shows that it was burning for the three nights previous, but on the night of December 1st, when the Palmer was towed aground, this careful witness from his point of observation 18 miles away said that the night was hazy, and that he could not see the light, and did not see it. There is a great volume of testimony offered by the respondents to show that these three lights were confusing. This is by no means sufficient to overcome the presumption that the careful, praiseworthy, and scientific officials of the government who located them understood their duty, and that even on that dangerous coast for many years they had been regarded as the best lights that could be afforded for the protection of the coast-wise and other shipping. It is also in evidence that since the stranding the light ship, which was then anchored further to seaward, has been made to change places with the gas buoy. Whatever may have been the motive of the government in making this change, and the evidence is silent on that subject, it cannot be held to justify under such conditions as are in evidence here the officers of the tug in mistaking the permanent fixed Cape Fear light, 14 miles to the landward, and 159 feet high, for a light of an entirely different character, furnished by acetylene gas, and with an entirely different flash, 4 or 4½ miles seaward, and only 18 feet high.

While the respondents in the opinion of the court have furnished no satisfactory excuse for their negligence resulting in the destruction of a fine and valuable vessel, with an important cargo, and for this reason under the authorities cited, and many others which might be, the tug is liable, the court may venture the suggestion that the calamity was probably due to the fact that neither Capt. Myers nor Capt. Lomn had ever traversed those waters. Capt. Lomn, indeed, had no license as a pilot except between Jacksonville and Wilmington, and while Capt. Myers, it is true, held a license as sea-going pilot as required by law, there was a decided deviation in the compass of the tug, that the card to correct this was not at hand, that with ample opportunity to do so no bearings were taken of the various important and controlling lights, and that after making the initial sounding when the tow started in the early morning only one other sounding

was made about 1:30 p. m., and no sounding at all thereafter until the ill-fated schooner, with all the hopes of its owners, had been towed, by the powerful steam tug which should have guided it to a harbor of safety, to its last resting place in the "graveyard of the Atlantic."

For these, and other reasons which might be stated, a decree in admiralty will be authorized by this court, adjudging the tug of the claimant respondent liable for the loss and destruction of the schooner Marie Palmer as alleged in the libel, and the record will be referred to Hon. Paul E. Seabrook, as special master in admiralty, to report to the court the amount which should be paid to the owners of the vessel, to the owners of the cargo, or to other claimants who may properly appear.

[4] While the master of the tug, Capt. Lomn, was a director in the South Atlantic Towing Company, the owner of the tug, the court is not clear for that reason that the owners were in privity with the tug in such sense that the benevolent action of Congress to limit the liability for loss to the value of the tug and its appurtenances is not applicable. It is the opinion of the court that this legislation should be construed liberally so as to protect the owners of maritime property from those overwhelming disasters which might result to them if all of their means should be held liable for maritime losses.

This being true, with some hesitancy, however, the court will authorize a decree to limit the liability in accordance with the petition, and the acts of Congress invoked.