### THE W. H. BALDWIN.

### KENNY v. CORNELL STEAMBOAT CO.

(Circuit Court of Appeals, Second Circuit. February 9, 1921.)

### No. 146.

1. Towage ⊂⟹11(1), 15(2)—Measure of liability for injury to tow.

A tug is not an insurer of her tow, but bound only to exercise that degree of skill and caution which prudent navigators exercise in performing similar service, and the burden is upon a tow, which alleges a breach of such duty, to show that there has been negligence or unskillfulness in performing the contract, to its injury.

2. Towage ⊂⟹11(3)—Mistake in judgment does not charge tug with negligence.

While a tug in her home waters is chargeable with knowledge of the ordinary currents and tides, channels, depth of water, and well-known

⊂⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

obstructions, a mere mistake in judgment with respect to the same is not sufficient to charge her with negligence, but the error must be one that a prudent navigator, under similar circumstances and conditions, would not have made.

**3. Towage ⬤⟶11 (10)—Tug not liable for injury to tow.**

A tug, which left her tow, a barge loaded with sand, at a dock in the same position in which the master had left the same and other barges many times previously without injury, and in which position the barge-master, who was agent of the owner, acquiesced, after making soundings, *held* not liable for injury to the barge when she settled on the bottom at low tide.

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty by William Kenny against the steam tug W. H. Baldwin; the Cornell Steamboat Company, claimant. Decree for libelant, and claimant appeals. Reversed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter and Theodore M. Hequembourg, both of New York City, of counsel), for appellant.

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The W. H. Baldwin, a steam tug, was employed to tow the barge Kenny Girls, with a cargo of sand, to the Burden Iron Company dock at Troy, N. Y. The barge was about 15 years old, with square ends, 109 feet long, and 28 feet broad, and 14 feet deep. She was loaded with 500 tons of sand and was made up in a tow in New York. At about 10 a. m. on July 26, 1917, she reached a point about 500 feet below the Burden Company's dock, and then the steam tug W. H. Baldwin took her out of the tow, making the barge fast with three lines on the tug's starboard side. This was an hour before high water. She was taken over the flats, and, after proceeding some distance, the bow of the barge grounded on the bottom, and the tug then cast off her lines and pushed her stern in toward the dock. The bargemaster threw two lines to the dock and made them fast to the barge, one at the bow and one at the stern. While the tug stood by, the bargemaster made soundings around the barge with a pike pole, and all present, with the exception of the barge master, say that the barge master announced that "he was all right." By proper inspection with this pole, he should have learned the true condition of the bottom. It was uneven, and slanting toward the channel. Thereafter the tide fell, and the barge twisted and broke one knee and strained another knee. Later, and on the next high tide, by means of a line, she was brought up alongside the dock, where she lay aground on a bottom at a point which was slanting from the bulkhead to the channel. The tug is charged with fault in docking the Kenny Girls in an improper manner and in leaving her in a dangerous and unsafe position.

[1] The decisions of this court have heretofore, in numerous cases,.

announced the obligations of a tug performing services such as the Baldwin was at the time in question. The tug is not an insurer of the tow, and the contract of towage requires one undertaking it to exercise that degree of caution, skill, and prudence which prudent navigators exercise in performing similar services. The burden is upon the barge, which alleged a breach of such duty, to show that there has been negligence and unskillfulness in performing the contract undertaken, to its injury. The Clarence L. Blakeslee, 243 Fed. 365, 156 C. C. A. 145; The Winnie, 149 Fed. 725, 79 C. C. A. 431; C. R. Sheffer, 249 Fed. 600, 161 C. C. A. 526.

[2] A tug, in her home waters, is chargeable with knowledge of the ordinary currents and tides, channels, depth of water, and well-known obstructions. The Marie Palmer (D. C.) 191 Fed. 79; The Reichert (D. C.) 258 Fed. 79. The one fact of injury to the tow raises no presumption of fault. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Battler, 72 Fed. 537, 19 C. C. A. 6. A mere mistake in judgment in respect to the tides or currents, channels, depth of water, or obstructions is not sufficient to charge the tug with negligence, for the error must be one that a prudent navigator, sailing under similar circumstances and conditions, would not have made. The Marie Palmer (D. C.) 191 Fed. 79; Gilchrist Transp. Co. v. Great Lakes Towing Co. (D. C.) 237 Fed. 432. The tug is bound to act and avoid, so far as reasonable care and skill can do it, dangerous points in navigation upon the voyage undertaken, which are known or should have been known to a master in charge of the tug. To do more would be to hold her to that degree of care which would make the tug responsible as an insurer. Navigators are not to be charged with negligence unless they make a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown. The Clarence Blakeslee, 243 Fed. 365, 156 C. C. A. 145.

[3] Guided by these rules of law, and examining the testimony in this record, we believe the appellee has failed to support the burden which the law casts upon it in order to support the decree below. There is no proof that there was a rock or obstruction, well known to river navigators or to those in charge of the tug, upon which the barge rested and suffered damage. The bargemaster stated that, when the tug got about 50 feet below the derrick, the barge was moved in toward the derrick until within 40 feet of the dock, when the barge's bow struck a lump, and the stern swung or pushed in as far as it would go. He says he then got two lines on the dock, when the tide fell, and the barge got aground on the slanting bottom, and began to twist and strain, resulting in the breaking of one knee and cracking another.

The libelant's witness, Downs, testified that he made soundings within a space of 400 feet up and down the river and 50 feet out from the dock; that within this space the depth of water ran a minimum of 5 feet 9 or 10 inches, but the shallow place was 40 or 50 feet out from the dock and below the crane. He said: "Outside it was gradually sloping as far as you could tell by sticking the pole down." He found no holes, and it indicated the same general depth of water. Those in

charge of the tug testified that they took the barge on the starboard side, and proceeded a trifle above the derrick, and pushed the barge in toward the dock, until the bow was grounded where she lay and was apparently in a safe position; that the bow was 8 or 10 feet from the dock and the stern a little further up.

The tugmaster pushed the Kenny Girls into this dock many times before. He said it was a soft gravel bottom, and was a dredged deep-water channel for about 80 or 100 feet from the dock. Inside of that there were the flats. He gives the average depth of water as about 8 feet and says there were no lumps on the bottom. The Kenny Girls looked level as he left her there. Another disinterested witness, familiar with the waters of the river at this point, and particularly at the Burden dock, said that the bottom was "gravel, soft gravel and mud," and there were no lumps or rocks of any kind at the place.

We think there was no fault in the navigation in landing the barge at the dock. The master of the tug was a licensed man of 12 years and worked in boating around the upper Hudson for many years. He had placed the same barge in the same way several times before, and testified that barges were usually left grounded at the dock. He said the barge was in line to go into the dock in the best water, and that other boats of the same type had been left there on many occasions before. He knew the bottom to be of soft gravel, fairly level, and with no lumps. He testified:

"Q. Tell us how you placed her there on those occasions? A. The same as this time unless we towed her up from Albany. * * *

"Q. When you finally left her, was she in the same position as this time? A. Many times; yes, sir; on rising water.

"Q. Without any objection from the captain? A. Yes, sir. * * *

"Q. Have you taken any other barges there? A. Yes, sir, sometimes two or three a week when they are running good, over years.

"Q. You have taken them there over a period of years? A. Yes, sir.

"Q. Many years? A. Yes, sir.

"Q. You, therefore, knew when you got this boat in position that she was all right? A. Yes, sir."

"Q. You consider you are doing your duty to leave a boat in a position like that? A. It is customary at that place, as the way they do business."

The witness Gathen testified:

"Q. Have you ever been on a tugboat that has placed any other boats at that dock? A. Yes, sir.

"Q. On several occasions? A. Yes, sir.

"Q. Have you ever been on a tugboat that has placed a box, scow or barge in a similar position? A. Yes, sir.

"Q. Several times? A. Several times."

Another witness, Cooley, testified:

"Q. Have you taken any boats to that dock? A. Yes, sir.

"Q. How many times? Could you state in a general way? A. Well, I would not say how many; a couple a week.

"Q. During a period of years? A. Yes, sir.

"Q. Did you hear the witness for the tugboat describe how they placed the Kenny Girls there on this particular occasion? A. I did.

"Q. Could you state whether you placed many other boats and have seen many other boats placed in the same general way? A. Yes, sir."

The credible testimony in the case indicates that the barge was docked in the usual manner and without complaint on the part of the barge captain. She ought to have been strong enough to withstand injury. The bargemaster was the agent of the owner as far as the care of the barge was concerned. He acquiesced in leaving the barge in the position the tug left her. He threw the lines to the dock and sounded around the barge in attempting to determine the character of the bottom which she would rest upon. He apparently was satisfied with the position in which she was placed. These circumstances indicate that the master, and therefore the owner, took the risk of allowing the barge to remain in the position she was in when the tug had fulfilled its service. Monk v. Cornell S. S. Co., 198 Fed. 473, 117 C. C. A. 232.

Concluding thus, we think the court below erred in holding the tug at fault.

Decree reversed.