## WANDELL v. NEW HAVEN TRAP ROCK CO. CONKLIN & FOSS CO. v. SAME. THE WINFIELD S. CAHILL.

(Circuit Court of Appeals, Second Circuit. November 13, 1922.)

### Nos. 28–30.

1. **Towage ☞15(2)—Evidence held to show tugs not negligent in mooring barges to stakeboat, instead of entering harbor.**

   Evidence *held* to show that tugs were not negligent in mooring scows and barges to a stakeboat one-half mile north-northwest from the westerly end of the breakwater in New Haven Harbor, instead of taking them into the harbor; storm warnings having been hoisted.

2. **Shipping ☞54—Charter held not to make charterer absolutely liable for return of scows in good condition.**

   A charter of scows in the form of a letter providing that the charterer agreed to return the scows in as good condition as when received less ordinary wear and tear, but further providing that if any accident happened to the scows, or they were damaged the owner, if able to collect from the insurance company, would not hold the charterer liable, unless compelled to do so by the insurance company, did not absolutely guarantee the return of the scows in as good condition as received, but merely provided an exemption from liability if the owner collected the insurance without suit.

3. **Shipping ☞39—Covenant to insure must be found in clear and explicit language.**

   A covenant by a charterer to insure is not implied, and can only be imposed where it is found in the agreement by clear and explicit language.

Appeals from the District Court of the United States for the Southern District of New York.

Libels in admiralty by M. D. Wandell against the New Haven Trap Rock Company, by the Conklin & Foss Company against the New Haven Trap Rock Company, and by M. D. Wandell against the steam tug Winfield S. Cahill, her engines, etc., claimed by the New Haven Towing Company, to recover damages to barges. Decrees for respondent and claimant, respectively. Libelants appeal. Affirmed.

Certiorari denied 43 Sup. Ct. 248, 67 L. Ed. ——.

Bigham, Englar & Jones, of New York City (C. Andrade, Jr., of New York City, of counsel), for libelant.

Leo J. Curren, of New York City (Eli J. Blair, of New York City, of counsel), for claimant.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for respondent.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. These suits in admiralty were tried together and will be considered in one opinion. In the first, Wandell, libelant, sues the New Haven Trap Rock Company, alleging that on April 13, 1917, he chartered the scows Curry, Ryerson, and Carter until December 25, 1917, and that the agreement was contained in the following letters of the appellant dated April 13, 1917, and the reply of the appellee of the same date:

"And you agree to return scows, free of charge to me, at the termination of charter, at any point in New York Harbor as I may direct, returning scows in as good condition as you receive them less ordinary wear and tear. It being agreed that if any accident happens to these scows, or they are damaged in any way while under charter to you, and I am able to collect for such damage or for such accident from the insurance company that has them insured, I shall not hold you liable or responsible for such damage, if I am able to collect same from the insurance company, and they do not compel me, under my policy, to collect for damages from you, or hold you liable for such damage."

And the reply thereto:

"We beg to say that we hereby accept the charter of your scows John P. Curry, John H. Ryerson, Henry R. Carter, and Mabel, under the terms as set forth in your letter of even date."

It appears that on October 23, 1917, the appellee's tug Clarence Blakeslee, towing the scows Wandell, Guynon, and Wilson, arrived at the appellee's stakeboat in New Haven Harbor and made fast. On the same evening the tug Winfield S. Cahill came into the harbor, towing the appellant's chartered scows Curry, Carter, and Ryerson. These scows were made fast to the scow Wilson, which was the rear of the Blakeslee tow. The flotilla remained there safely during the night of October 23, and on the next morning the wind increased, and continued to increase in violence until about 12:15, when it was blowing some 50 to 60 miles an hour, with a heavy sea. The Blakeslee stood by the tow, passed additional lines to the scow, and did everything possible to protect them until 12:15, when the line between the Guynon and the Wandell parted. The latter being made fast to the stakeboat, the five scows broke adrift. The Blakeslee found it impossible to pick up the scows, and they either sank or went ashore.

The libel of Conklin & Foss Company was filed against the appellee for the damage due to the loss of the Wilson and the Guynon.

The third libel is filed by Wandell against the steam tug Winfield S. Cahill, alleging that the Cahill brought the barges Curry, Carter, and Ryerson to the stakeboat, and carelessly and negligently tied onto the stakeboat. The stakeboat in question is one-half mile north-northwest from the westerly end of the breakwater in New Haven Harbor. The Blakeslee moored her three barges tandem on the stakeboat and lay on the portside of the Wandell. The Blakeslee was about 90 feet long and was owned by the appellee, New Haven Trap Rock Company. The barges Guynon and Wilson were owned by Conklin & Foss Company, and were each about 115 feet long. The Cahill moored her three barges tandem astern of the Wilson, and she lay on the port side of the Wil-

son and the Curry. Both tows were bound west for New York, and put into New Haven Harbor to await the flood tide, which was to start about 10:30 that night. At 10:06 the government set an easterly storm signal at Five Mile Point, which is about two miles east-northeast from the stakeboat.

[1] The first question presented is whether there was negligence on the part of either of the tugs in placing the scows and barges at the stakeboat, or in remaining there after the storm warnings were hoisted. On this evidence questions of fact were presented. The testimony justified the conclusions of the court below that the wind velocity at the Weather Bureau stations did not exhibit an extraordinary storm, but it does appear that the velocity at breakwater was in excess of that at the station. The breakwater was build for the purpose of affording a safe harbor in any southerly or easterly wind, and the only wind where it might be unsafe would be from the northwest, where scows might hold at anchor and would be blown on the breakwater to leeward. This stakeboat had been in use for some years, and it appears that the boats lay all right until the hawser between the Guynon and the Wandell parted. The masters could properly seek this mooring, and the propriety of staying there, rather than taking the scows up into the harbor, was testified to by men familiar with the waters thereabouts. It is true that there is some testimony to the effect that it would have been safer to take the scows up into the harbor, but the weight of the testimony justifies the conclusion that the place where they did lie was perfectly safe. Neither master of the tugs saw fit to attempt to move the scows into the harbor when the storm was on.

To put in to this stakeboat was an everyday practice up to this time. It appears that the storm which did break was the worst, that had occurred in New Haven in many years. It would have been hazardous to attempt to take the tows from the stakeboat into the harbor after the storm arose. Such of the boats as went adrift were lost after they got beyond the breakwater, despite the efforts of the tugs to save them. This would indicate that the boats would not have been safer in the harbor. We think the appellants failed to sustain the burden of proof in the claim of negligence in making the mooring in question or in remaining there. The Wm. H. Baldwin (C. C. A.) 271 Fed. 411; The Eastern (C. C. A.) 280 Fed. 711.

[2, 3] But it is contended that, as to the claim presented by the first libel, the charter for the three scows, the Curry, Carter, and Ryerson contained an absolute guaranty to return the scows in as good condition as received, ordinary wear and tear excepted. The letter of Wandell must be read in its entirety. It is undoubtedly true that if the charter contained but the first paragraph of that letter, there would be an acceptance of this responsibility; but the next paragraph must be read with it, and there it appears that it was not intended to make the appellee an insurer. What was intended provided only for an exemption from liability when the appellant Wandell collected insurance for the loss. A covenant to insure is not implied, and can only be imposed where it is found in an agreement by clear and explicit language. Mulvaney v. King Paint Co., 256 Fed. 615, 167 C. C. A. 642. In

Sun Printing Co. v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, the covenant of obligation assumed clear and explicit liability by the charterer for all loss and damage, even if caused by third parties or the elements.

We think the letter is not a clear and explicit assumption of liability, which would require imposing the liability of an insurer upon the appellee. By the phrase, "if any accident happens to these scows, or they are damaged in any way while under charter to you, and I am able to collect for such damage or for such accident from the insurance company that has them insured, I shall not hold you liable or responsible for such damage, if I am able to collect same from the insurance company, and they do not compel me, under my policy, to collect for damages from you, or hold you liable for such damage," it is intended to provide only for an exemption from liability when the owner collected insurance for the loss and was not compelled to sue. If it was the intention of the parties to guarantee against loss, clear and explicit assumption of liability could have been expressed.

Decree affirmed.