## THE PRIDE.

### THE WILLIAM J. TRACY.

### SEGRAVE v. McLAIN LINE, Inc., et al.

District Court, E. D. New York.
Oct. 21, 1941.

Hagen & Eidenbach, of New York City (Henry C. Eidenbach, of New York City, of counsel) for libellant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for McLain Line, Inc.

Bigham, Englar, Jones & Houston, of New York City (Charles A. Van Hagen, Jr., of New York City, of counsel), for Newark Plaster Co.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for Pennsylvania R. Co.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for Tracy Towing Line, Inc.

GALSTON, District Judge.

The libel alleges that the Pride, a coalboat, owned by Segrave, was chartered on September 16, 1940 by McLain Line, Inc. for an indefinite period at an agreed rate of charter hire, the boat to be returned in the same condition received, ordinary wear and tear excepted.

The claim is that the Pride was damaged by grounding on an uneven bottom adjacent to the dock of the Newark Plaster Company. The libel was filed against the McLain Line and the Newark Plaster Company. The McLain Line impleaded the Pennsylvania Railroad Company, and it, in turn, impleaded the tug Tracy and the Tracy Towing Line.

The Pride, under the orders of the McLain Line, was towed by the Pennsylvania Railroad tug to South Amboy. There a cargo, consigned to the Newark Plaster Company, of 498 tons of soft coal was loaded on the boat.

On the afternoon of September 18th the Pride left South Amboy in tow of the tug Baltimore. On the way a stop was made at Elizabethport, at which point the Tracy took the Pride and another boat in tow. Thereafter the other boat was dropped at some intermediate point and the Tracy, with the Pride on her port side, proceeded to the dock of the Newark Plaster Company, arriving there on September 19th at about 12:30 A. M.

The Pride was apparently in good condition. She had carried cargo on six or seven trips between August 6th and September 15th and had suffered no damage. She had been regularly inspected, and was inspected by her master after having been loaded with the cargo in question.

When the Tracy and the tow arrived at the dock of the Newark Plaster Company, it was found that the steamer Sunia was tied up alongside the northerly part of the dock loading plaster. The steamer was lying with her port side to the dock and the Tracy put the Pride to the dock, also port side, astern of the steamer. Lines were made fast by the deck hand of the tug and by the master of the coal-boat, the former putting the bow lines out and the

latter the stern lines. One line ran from the port cleat on the bow to the dock and the other from the corner stern cleat. In addition there were two cross or spring lines, one from the bow and one from the stern. After the boat was thus made fast the man on the Pride used his pump but found no water.

At about four o'clock in the morning, on hearing some noise, the bargeman went on deck, investigated and found the boat listed to starboard, with water of two and a half feet in depth on that side.

The next day, the Sunia, having been unloaded, the Pride was shifted alongside the dock to the unloading crane and her cargo of coal removed. Then she was taken to drydock and a survey held. A broken plank was found on the bottom, with the seams on the starboard side open and her port bow cleat pulled. The plank was about nineteen feet from the bow.

The night watchman of the Plaster Company testified that his attention was first directed to the Pride when he heard pumps going some time between twelve and one o'clock. He found that the barge was tied up but overlapping the dock about half the length of the barge. There is a discrepancy in the stories told by the captain of the coal barge and this night watchman in respect to the distance of the bow of the barge from the stern of the steamer. The former said about twelve feet separated them; the latter about fifty feet. The bargeman's estimate of the distance, however, was confirmed by Swensen, the representative of the owner of the barge, who arrived at the dock the next morning pursuant to a call. The watchman also testified that he talked with the bargeman and asked what his trouble was, to which the response was that the boat was leaking. It appeared to the watchman as though the boat were grounded. Nevertheless the bargeman did not ask for assistance. The watchman also told the bargeman that he was docked in the wrong place, for he had observed that during the last seven or eight years no boats had been moored adjacent to the northerly part of the Public Service dock. The bargeman, on the other hand, denies having had any talk with anyone on the dock that night.

Swensen had made some sort of sounding on the morning of his arrival and determined that the berth was hard and uneven. His testimony was not convincing, particularly in the light of that given by the diver who made an examination of the bottom for a distance of twenty-five feet from the bulkhead, and for a distance of two hundred feet northerly from the southerly boundary line. Gardner, the diver, found a mud bottom having a gradual slope from the bulkhead to the channel. He encountered no hard objects; but on examining the bottom south of the Newark Plaster Company pier, adjacent to the unused pier of the Public Service Company, for a distance of approximately fifty feet along the pier and twenty-five feet out, he found concrete blocks, about twelve by twelve by seven inches, and also a part of a cylinder of an automobile engine. He also found scrap iron and some round cobbles. The bottom was hard and differed from that along the dock of the Newark Plaster Company.

Gustavsen, the pilot of the tug William J. Tracy, testified that as he approached the dock of the Newark Plaster Company with the Pride in tow on his port side, he observed the steamer alongside the dock. His description of the maneuver for bringing the Pride to the dock is far from satisfactory. He said he was one hundred and fifty feet out from the dock at that time and that when he got abreast of the Newark Plaster dock he stopped his boat and permitted it to drift on the ebb tide to the dock: "When I came close to the Newark Plaster dock, close to the ship, I stopped my boat and I let the tide drift me down, and when I was clear of the steamer's stern I came ahead one bell and we went right alongside of the dock." He had been proceeding on his starboard hand and stemming the ebb tide on his way up the river, and there came a time when it was necessary to get to the port side of the river. He said he didn't attempt to do that until he was abreast of the Newark Plaster dock. He admitted that as he stopped his boat the tide tended to carry his boat down the river, though, he added, at the same time it would set him over to the dock. As he approached the pier he came in at a five degree angle. Since he explained that he had not stopped his boat until he was abreast of the steamer, and the steamer was two hundred and forty-eight feet in length, and the dock was four hundred feet, with the stem of the steamer close to the northerly end of the dock, a margin of one hundred and fifty feet south of the steamer was available for docking the Pride, the length of which was one hundred and two feet. The

pilot said that he did not go ahead until he was clear of the ship's stern, that is to say until he saw that the coal-boat was clear of the ship's stern.

This description of the pilot is hard to follow. If he had reached a point abreast of the steamer, 150 feet out in the channel, before he stopped and permitted the tug and tow to drift down with the tide, it was a physical impossibility for him to come in one hundred and fifty feet from the channel to the dock within the distance of one hundred and fifty feet available south of the Sunia's stern unless he had drifted south of the Newark Plaster Company dock and nearer the unused dock of the Public Service Company than he was willing to admit.

The burden was on the libellant to prove the faults ascribed in the libel to the McLain Line and to the Newark Plaster Company. There was not a demise to the McLain Line, as the libel alleged. It was stipulated by the libellant at the trial that the McLain Line telephoned the libellant and asked him whether he had a barge available to take a cargo of approximately five hundred tons of soft coal from South Amboy to the Newark Plaster Company. The compensation for the services of the barge Pride was on a tonnage basis, the libellant being paid a fixed rate per ton and permitting the McLain Line to deduct a commission. Then the McLain Line instructed the Pennsylvania Railroad Company to tow the Pride to South Amboy. The Pride was loaded by the Pennsylvania Railroad Company under instructions from the shipper of the coal and was sent out in a Pennsylvania Railroad Company tow for delivery to the Newark Plaster Company. The transaction did not amount to a demise of the vessel to the McLain Line. See Jones and Laughlin Steel Corp. v. Vang, 3 Cir., 73 F.2d 88. The McLain Line had no dominion and control of the boat in the sense that it did anything to it other than have the Pennsylvania Railroad Company load the barge with the coal and send it out pursuant to the orders of the consignee. The McLain Line could not use the boat in its own business. The libellant knew where the boat was to be taken, i. e. to the dock of the Newark Plaster Company, and there is nothing that shows that the McLain Line had any reason to believe that there was not a safe berth for the boat at that dock. The McLain contends that in this instance it was acting as a broker securing a cargo of coal for the libellant to transport to the respondent, Newark Plaster Company, as in The Jungshoved, 2 Cir., 290 F. 733. The proof does not show that there was obligation upon the McLain Line to select a safe berth free of obstructions.

The fault charged to the Newark Plaster Company is that it failed to furnish and maintain a berth in a suitable, safe and proper condition.

The proof discloses that the Plaster Company ordered the boat for delivery to its dock; also that there were one hundred and fifty feet available south of the steamer then moored to the dock alongside of which the Pride could have been placed. The libellant fails in its proof to show that the berth thus afforded was foul or unsafe. The history of mooring alongside the dock over a period of many years affords likewise no evidence of a foul berth.

As to the Pennsylvania Railroad Company, there is no negligence alleged in the libel nor disclosed in the proof. That company received an order from the coal shippers to load the Pride at South Amboy and tow her to the Newark Plaster Company dock. The Pennsylvania Railroad Company had no contractual relationship with any party to the suit except the Tracy Towing Line, Inc., which company was employed as an independent contractor to tow the Pride up the Passaic River to the dock of the Newark Plaster Company.

There remains for consideration the responsibility, if any, of the Tracy Towing Line.

As has been indicated, the Pride was in apparently good seaworthy condition on the day in question. So far as appears the only possible explanation of the cause of the damage was the condition of the bottom at the northerly end of the Public Service dock, adjacent to the southerly end of the dock of the Newark Plaster Company. The presence of concrete blocks, a discarded part of the cylinder of an automobile engine and other debris would account for the damage to the bottom plank of the Pride if the Pride had come in contact with those objects. It is entirely possible and indeed likely that such was the case because, as has been said hereinbefore, the maneuvering of the Tracy tug in giving the Pride a berth, as explained by the tug's pilot, does not seem physically possible. For he had to bring the Pride one hundred and fifty feet from where it was in the channel to the Plaster

Company dock and moor the vessel within the one hundred and fifty feet astern of the steamer. To accomplish that, as he described the maneuver, he had to travel along the hypotenuse of an isosceles right triangle. The maneuver could not have been accomplished unless the tug and tow fell below the southerly end of the Newark Plaster Company dock. Moreover it must be observed that the master of the Pride, under cross-examination, gave a version which cannot be reconciled with that of the pilot.

"Q. Now this tug came up opposite the Newark Plaster and then turned in sharply? A. No, sir, you go right straight ahead between the steamer and he put me with my port side on the dock.

"Q. He came up the river and he came in gradually? A. Right straight, no turn at all.

"Q. He came right into the berth at the Newark Plaster Company? A. Yes, sir."

Later on he stated that in passing the dock south of the Newark Plaster Company they were about "fourteen or twenty feet" from that dock. In that movement it is quite possible that the bottom of the Pride was brought in contact with submerged objects. In consequence the fact that subsequently the Pride was moored in a usual manner does not exonerate the tug, and thus the cases cited by the Tracy Towing Line, The W. H. Baldwin, 2 Cir., 271 F. 411, and the Eastchester, 2 Cir., 20 F.2d 357, are not in point.

On the other hand, it is not clear why only one bottom plank was damaged. However, that condition would be just as difficult of explanation had the damage been done by the alleged uneven bottom adjacent to the dock of the Newark Plaster Company. On the whole the only reasonable inference is that the damage was caused as a result of navigating too closely to the dock of the Public Service property. The record discloses that that dock had been in disuse for a period of a number of of years, a fact which should have been known to the pilot of the Tracy, who was an experienced navigator in those waters.

The pleadings should conform to the proof. Otherwise the libel will have to be dismissed against all parties. Such motions may be made within ten days from the filing of this decision.